JDGE SCHEINDLIN

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

07 CV 10465

---------------------------------------------------------- X   Civil Action No.

DORIS STAEHR, Derivatively on Behalf of
WYETH,

                  Plaintiff,

   vs.

ROBERT ESSNER, BERNARD POUSSOT,
GREGORY NORDEN, JOHN R. TORELL,
III, JOHN D. FEERICK, JOHN P.
MASCOTTE, MARY LAKE POLAN, IVAN
G. SEIDENBERG, WALTER V. SHIPLEY,
ROBERT S. LANGER, FRANCES D.
FERGUSSON, GARY L. ROGERS, VICTOR
F. GANZI, RAYMOND J. MCGUIRE,
KENNETH J. MARTIN and RICHARD L.
CARRION,

                  Defendants,

   -and-

WYETH, a Delaware corporation,

                Nominal Defendant.

---------------------------------------------------------- X

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS, UNJUST
ENRICHMENT AND VIOLATIONS OF THE
SECURITIES EXCHANGE ACT OF 1934



NOV 2 8 2007
U.S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Wyeth (sometimes referred to as the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between January 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to Wyeth and other damages, such as to its reputation and goodwill.

2.      Wyeth discovers, develops, manufactures, distributes and sells pharmaceuticals, consumer healthcare, and animal health products. Between 2003 and 2006, Wyeth directed the Phase 3 testing of a new drug referred to as desvenlafaxine succinate ("Pristiq"). Wyeth was testing the drug to treat post-menopausal symptoms such as hot flashes and night sweats. During June 2006, defendants directed Wyeth to announce that it had submitted a New Drug Application ("NDA") to the Food and Drug Administration ("FDA") for use to treat these symptoms.

3.      Throughout the Relevant Period, defendants directed Wyeth to issue improper statements concerning the likelihood that Pristiq would achieve FDA approval. These improper statements caused an artificial inflation of Wyeth's stock price. Certain defendants took advantage of this inflation by selling over $68 million of their personally held Wyeth shares. Moreover, Wyeth's board of directors (the "Board") authorized the Company to repurchase of over $1.4 billion of the Company's shares at artificially inflated prices.

4.      On July 24, 2007, Wyeth issued a press release announcing that the Company had received an approvable letter from the FDA in regards to Pristiq. The approvable letter explained that the FDA would not approve Wyeth's NDA until the Company provided additional information regarding Pristiq's potential for serious adverse cardiovascular and hepatic effects. Further, the FDA requested that this information come from a clinical trial of one year or further in duration. In sum, Wyeth will be unable to obtain FDA approval of Pristiq until it conducts at least a year's worth of

- 1 -

additional studies to establish that the drug's benefits outweigh its adverse effects. Wyeth estimates that Pristiq represents over $2 billion in revenue. These revenues will now be delayed for at least a year and may be lost if Wyeth fails to gain FDA approval for Pristiq.

5.      In the wake of this disastrous disclosure, Wyeth's value fell from over $58.00 per share to less than $48.00 per share—wiping out more than $13.3 billion worth of market capitalization. Moreover, during November 2007, several Wyeth shareholders filed class action lawsuits against the Company alleging securities laws violations.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice. Several of the defendants are citizens of New York.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Wyeth is listed on the New York Stock Exchange; and (ii) Wyeth conducts business in this District.

## THE PARTIES

9.      Plaintiff Doris Staehr is and was, at times relevant hereto, an owner and holder of Wyeth stock.

10.      Nominal defendant Wyeth is a Delaware corporation with its principal executive offices located at Five Giralda Farms, Madison, New Jersey. Wyeth discovers, develops, manufactures, distributes and sell pharmaceuticals, consumer healthcare and animal health products.

- 2 -

11. Defendant Robert Essner ("Essner") is Wyeth's Chief Executive Officer and has been since May 2001. Essner is also Wyeth's Chairman of the Board and has been since January 2003 and a director and has been since 1997. Essner was Wyeth's President from July 2000 to April 2006 and Chief Operating Officer from July 2000 to May 2001. Because of Essner's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Essner participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Wyeth shareholders. Defendant Essner received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,662,000 | $18,201,380 | 5,305,400 | 3,000,000 | 4,531,044 | $147,138 |

During the Relevant Period, Essner sold 258,815 shares of Wyeth stock for proceeds of $13,240,861.81.

12. Defendant Bernard Poussot ("Poussot") is Wyeth's President and Vice Chairman of the Board has been since April 2006. Poussot is also Chief Operating Officer and has been since January 2007 and a director and has been since January 2007. Poussot was Wyeth's Executive Vice President from June 2002 to April 2006 and Senior Vice President from January 2001 to June 2002. Because of Poussot's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as

- 3 -

reports and other information provided to him in connection therewith. During the Relevant Period, Poussot participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders. Defendant Poussot received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $967,035 | $5,518,110 | $4,060,380 | 1,700,000 | 2,003,211 | $160,112 |

During the Relevant Period, Poussot sold 272,669 shares of Wyeth stock for proceeds of $14,153,236.05.

13. Defendant Gregory Norden ("Norden") is Wyeth's Senior Vice President and Chief Financial Officer ("CFO") and has been since June 2007. Norden was Wyeth's Executive Vice President and CFO, Pharmaceuticals division from 2000 to June 2007. Norden has previously served in various roles at Wyeth from 1989 to 2000 including Senior Vice President, Finance and CFO, American Home Food Products and Senior Vice President and CFO, Wyeth Laboratories—North America. Because of Norden's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Norden participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

14. Defendant John R. Torell, III ("Torell") is a Wyeth director and has been since 1982. Torell is also a member of the Audit Committee and has been since at least 2006. Because of Torell's positions, he knew, consciously disregarded, was reckless and grossly negligent in not

- 4 -

knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Torell participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

15. Defendant John D. Feerick ("Feerick") is a Wyeth director and has been since 1987. Feerick is also the Chairman of the Audit Committee and has been since at least 2006. Because of Feerick's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Feerick participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

16. Defendant John P. Mascotte ("Mascotte") is a Wyeth director and has been since 1995. Mascotte is also a member of the Audit Committee and the Compensation and Benefits Committee and has been since at least 2006. Because of Mascotte's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Mascotte participated in the issuance of improper statements, including the

- 5 -

preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

17.     Defendant Mary Lake Polan ("Polan") is a Wyeth director and has been since 1995. Polan is also the Chairman of the Science and Technology Committee and has been since February 2006. Because of Polan's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Polan participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

18.     Defendant Ivan G. Seidenberg ("Seidenberg") is a Wyeth director and has been since 1996. Seidenberg is also the Chairman of the Compensation and Benefits Committee and has been since at least 2006. Because of Seidenberg's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Seidenberg participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

19.     Defendant Walter V. Shipley ("Shipley") is a Wyeth director and has been since 2000. Shipley is also a member of the Compensation and Benefits Committee and has been since at least 2006. Because of Shipley's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the

- 6 -

business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Shipley participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

20.     Defendant Robert S. Langer ("Langer") is a Wyeth director and has been since January 2004. Langer is also a member of the Science and Technology Committee and has been since February 2006. Because of Langer's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Langer participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

21.     Defendant Frances D. Fergusson ("Fergusson") is a Wyeth director and has been since January 2005. Fergusson is also a member of the Science and Technology Committee and has been since February 2006. Because of Fergusson's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Fergusson participated in the issuance of improper statements, including the preparation of

the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

22.     Defendant Gary L. Rogers ("Rogers") is a Wyeth director and has been since October 2005. Rogers is also a member of the Audit Committee and the Compensation and Benefits Committee and has been since 2006. Because of Rogers' positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Rogers participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

23.     Defendant Victor F. Ganzi ("Ganzi") is a Wyeth director and has been since December 2005. Ganzi is also a member of the Audit Committee and the Compensation and Benefits Committee and has been since 2006. Because of Ganzi's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Ganzi participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

24.     Defendant Raymond J. McGuire ("McGuire") is a Wyeth director and has been since October 2006. Because of McGuire's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via

- 8 -

access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, McGuire participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

25.    Defendant Kenneth J. Martin ("Martin") was Wyeth's CFO from February 2000 to June 2007. Martin was also Wyeth's Vice Chairman of the Board from April 2006 to June 2007; Executive Vice President from June 2002 to April 2006; Senior Vice President from February 2000 to June 2002; and Senior Vice President and CFO, Pharmaceuticals division from October 1998 to January 2000. Because of Martin's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Martin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders. Defendant Martin received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $782,840 | $5,332,090 | $1,777,980 | 1,200,000 | 1,604,324 | $28,985 |

During the Relevant Period, Martin sold 743,479 shares of Wyeth stock for proceeds of $40,856,886.66.

26.    Defendant Richard L. Carrion ("Carrion") was a Wyeth director from 2000 to April 2006. Carrion was a member of the Audit Committee in 2006. Because of Carrion's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have

- 9 -

known the adverse, non-public information about the business of Wyeth including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Carrion participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Wyeth shareholders.

27.     The defendants identified in ¶¶11-12, 14-26 are referred to herein as the "Director Defendants." The defendants identified in ¶¶11-13, 25 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶11-12, 25 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers, directors and/or fiduciaries of Wyeth and because of their ability to control the business and corporate affairs of Wyeth, the Individual Defendants owed Wyeth and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Wyeth in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wyeth and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each director and officer of the Company owes to Wyeth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

30.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wyeth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Wyeth, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Wyeth, including Pristiq's FDA approval prospects.

31.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wyeth, and was at all times acting within the course and scope of such agency.

32.   To discharge their duties, the officers and directors of Wyeth were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Wyeth were required to, among other things:

(a)   refrain from acting upon material inside corporate information to benefit themselves;

(b)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's reporting would be true and accurate at all times;

- 11 -

(e)     remain informed as to how Wyeth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wyeth, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Wyeth's Board during the Relevant Period.

34.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent the prospects of Pristiq gaining FDA approval, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of class action lawsuits that allege violations of securities laws. As a result, Wyeth has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the

- 12 -

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting the prospects of Pristiq gaining FDA approval; (ii) enhance the Individual Defendants' executive and directorial positions at Wyeth and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the investing public, including shareholders of Wyeth, regarding the Individual Defendants' management of Wyeth's operations, the Company's financial health and stability, and its future business prospects, specifically related to the FDA approval of Pristiq, that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Pristiq would not gain FDA approval in the near term.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to facilitate their sale of over $68 million of their personally held shares.

39.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

41.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to Wyeth a duty to insure that the Company's public filings and statements fairly represent the operations and business prospects of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

42.     This material, non-public information principally concerned Pristiq's FDA approval prospects.  The Director Defendants owed a fiduciary duty to Wyeth to ensure that Wyeth's Relevant Period statements properly disclosed all material facts concerning the Company, including the prospects of its Pristiq drug.  Defendants Fergusson, Langer and Polan as members of the Science and Technology Committee, had a special duty to know and understand this material information as set out in the Science and Technology Committee's charter which provides that the Science and Technology Committee is responsible for reviewing and reporting to the Board regarding Wyeth's research and development programs.  Furthermore, defendants Carrion, Feerick, Ganzi, Mascotte, Rogers and Torell, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for reviewing and discussing information and guidance provided to analysts and ratings agencies.

43.     Defendants Poussot, Essner, Norden and Martin, as Wyeth officers, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, defendants Poussot, Essner, Torell, Feerick, Mascotte, Polan, Seidenberg, Shipley, Langer, Fergusson, Rogers, Ganzi, McGuire and Carrion, as directors of Wyeth, had ample opportunity to discuss this material information with

management and fellow directors at any of the Board meetings that occurred during the Relevant

Period, as well as at meetings of committees of the Board.  Despite these duties, the Individual

Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or

inactions, the following improper statements to be disseminated by Wyeth to the investing public and

the Company's shareholders during the Relevant Period.

44.     On May 25, 2006, the Individual Defendants caused or allowed Wyeth to issue a press

release announcing that Pristiq had shown significant improvement as demonstrated by the

Company's phase 3 testing of the drug.  In particular, the press release provided a follows:

> Wyeth Pharmaceuticals, a division of Wyeth, this week presented for the first time
> phase 3 data and results from other studies concerning its investigational drug for
> major depressive disorder (MDD), desvenlafaxine succinate (DVS-233), a novel
> serotonin-norepinephrine reuptake inhibitor (SNRI) at the 2006 American Psychiatric
> Association Annual Meeting in Toronto.
>
> Overall, the phase 3 data results showed desvenlafaxine succinate
> significantly improved depressive symptoms in adult patients compared to placebo.
> In a separate study investigating QTc prolongation involving healthy adult female
> subjects, desvenlafaxine succinate 200 mg and 600 mg doses did not affect the QT
> interval at the study's primary endpoint at eight hours post dose.  Studying a drug's
> effect on the QT interval is one of many methods used to help determine a drug's
> overall safety profile.
>
> Wyeth Research discovered and developed desvenlafaxine succinate.  In
> December 2005, Wyeth submitted a New Drug Application (NDA) to the U.S. Food
> and Drug Administration (FDA) for desvenlafaxine succinate for the treatment of
> MDD.
>
> "The phase 3 data showed that desvenlafaxine succinate can help improve
> symptoms in adult patients suffering with depression," says Nicholas A. DeMartinis,
> M.D., Assistant Professor and Associate Director of Clinical Operations of the
> Neuropsychopharmacology Treatment Research and Training Center at the
> University of Connecticut Health Center and principal investigator of the clinical trial
> presented in the scientific session.  "Because a substantial number of patients with
> depression do not respond to current antidepressant treatments, it is important that
> new treatments continue to be developed to provide patients and physicians with
> additional treatment options," Dr. DeMartinis adds.
>
> "Wyeth is pleased to be able to report these promising findings that have the
> potential to add value to the management and treatment of major depressive
> disorder," says Philip Ninan, Vice President, Neuroscience, Global Medical Affairs.
> "As a leader in neuroscience, Wyeth is committed to its continuing development of
> medications that help address the unmet needs of people living with mental illness."
>
> Abstract: Efficacy and Safety of Desvenlafaxine Succinate in the Treatment of Major
> Depressive Disorder
>
> The results of the first study presented, a phase 3, multicenter, randomized,
> double-blind clinical trial of desvenlafaxine succinate in 461 adult patients with

MDD, showed significant reduction in Hamilton Depression Rating Scale (HAM-D17) scores for the desvenlafaxine succinate 100 mg (p=.0038) and 400 mg (p=0.0023) dose groups versus the placebo group. For the 200 mg dose group, reduction in the HAM-D17 trended towards significance (p=0.0764). All desvenlafaxine succinate dose groups showed significant improvement on the Clinical Global Impression-Improvement (CGI-I) scale, a secondary efficacy measure, versus placebo (p<0.05). Additionally, the 100 mg desvenlafaxine succinate group demonstrated significant improvement versus placebo in depression-related pain scores utilizing the Visual Analog Scale-Pain Intensity (VAS-PI) scale (p=0.002).

Abstract: Randomized, Double-Blind, Placebo-Controlled Study of Desvenlafaxine Succinate in Major Depressive Disorder

The results of a second phase 3, randomized, double-blind, placebo-controlled study of desvenlafaxine succinate were also presented at the APA annual meeting. In this second study, 375 adult patients with major depressive disorder were randomized to receive desvenlafaxine succinate once-daily doses of 200 mg, 400mg, or placebo. Adjusted mean change from baseline in HAM-D17 total score, the primary efficacy measure, was significantly greater for the desvenlafaxine succinate 200 mg (p=0.002) and 400 mg (p=0.008) dose groups versus placebo. In addition, overall VAS-PI scores for the desvenlafaxine succinate 200 mg group were significantly better than placebo (p=.002). There was a trend toward significance for the desvenlafaxine succinate 400 mg group (p=0.053).

In the two phase 3 desvenlafaxine succinate clinical trials presented at the APA, adverse events, including nausea and increased blood pressure, were generally consistent with the SNRI class. The incidence of nausea was greatest during week 1 of treatment and decreased dramatically afterwards to rates that remained low for the remainder of the study. The most common treatment emergent adverse events (*i.e.*, those reported by at least 10 percent of desvenlafaxine succinate patients, and twice the rate of patients on placebo) were abdominal pain, asthenia, anorexia, constipation, dry mouth, nausea, vomiting, dizziness, insomnia, nervousness, somnolence, sweating, tremor, vertigo, and abnormal ejaculation. Most of these adverse events in both studies were mild or moderate in severity.

Abstract: Double-blind, Placebo- and Moxifloxacin-controlled Crossover Study of the Effects of Desvenlafaxine Succinate on QT Interval in Healthy Adult Female Subjects

To help determine whether desvenlafaxine succinate had effects on the QT interval, a randomized, double-blind study of 71 healthy adult women (ages 18 to 55) was conducted. In the study, desvenlafaxine succinate 200 mg and 600 mg dose groups did not affect the QT interval at the primary endpoint at eight hours post dose. Because many drugs are known to be associated with a potential to prolong QT interval, the FDA developed guidance recommending that all manufacturers conduct a QT interval study to help determine whether any new agent may potentially prolong the QT/QTc interval, one of many important measures of cardiovascular safety.

Abstract: Desvenlafaxine: Preclinical Evidence for Serotonin and Norepinephrine Reuptake Inhibition, Antidepressant, and Antinociceptive Activity

According to research also presented during the APA, desvenlafaxine succinate exhibited activity in preclinical models of depression and anxiety.

45.     On June 26, 2006, the Individual Defendants caused or allowed Wyeth to issue a press release announcing the submission of an NDA to the FDA regarding Pristiq. Wyeth had submitted Pristiq for the treatment of moderate to severe vasomotor symptoms associated with menopause, such as hot flashes and night sweats. The press release emphasized that Pristiq would give physicians additional options to help meet the individualized needs of their menopausal patients. The press release further stated that: "'The simultaneous submission of these two separate NDAs emphasizes Wyeth's position as a leader and innovator in women's health. Wyeth continues to support clinical research and drug development with the goal of meeting the health care needs of women worldwide.'"

46.     On October 5, 2006, Wyeth hosted an investor conference to discuss Pristiq. During the conference, Wyeth spokespersons stated that Pristiq was similar to the Company's Effexor XR drug in terms of efficacy, safety and tolerability and was expected to generate sales exceeding $2 billion. Wyeth spokespersons further stated that Pristiq "[c]an become the first and only SNRI proven to effectively address the distinctive symptoms and therapeutic needs of women with . . . vasomotor symptoms." A slide titled "Pristiq™ Phase 3 Summary" that was presented at the conference stated:

- Safety
  - Early discontinuation rate below 10% at end of week 1
  - Tolerability profile improved after week 1
    - Predominant systems – nausea, dizziness, insomnia, somnolence
    - Median duration of nausea: 3-4 days

47.     On October 5, 2006, the Individual Defendants caused or allowed Wyeth to issue a press release concerning the matters discussed during the October 2006 investor conference. The press release stated as follows:

Pristiq (Desvenlafaxine Succinate) (Major Depressive Disorder and Vasomotor Symptoms)

* * *

FDA action for the second application for Pristiq for vasomotor symptoms (VMS) associated with menopause is anticipated in April 2007. Pristiq is expected to

provide significant relief of hot flushes (decrease in number and severity) associated with menopause.

If approved, Pristiq will be the first non-hormonal treatment indicated for relief of VMS.

48. On January 24, 2007, the Individual Defendants caused or allowed Wyeth to issue a

press release that disclosed that the Company had received an FDA approvable letter in regards to

Pristiq. The letter indicated a number of conditions that Wyeth would have to fulfill before the FDA

approved Pristiq. In particular the press release provided as follows:

> Wyeth Pharmaceuticals, a division of Wyeth, announced today that the Company has received an approvable letter from the U.S. Food and Drug Administration (FDA) for Pristiq™ (desvenlafaxine succinate), a serotonin-norepinephrine reuptake inhibitor (SNRI) studied as a treatment for adult patients with major depressive disorder (MDD). The letter was received January 22.
>
> "The approvable letter is in line with Wyeth's expectations and we remain on track with our plans for Pristiq" says Joseph Mahady, President, Wyeth Pharmaceuticals – The Americas and Global Businesses. "We are working toward resolution of all outstanding issues at our manufacturing site in Guayama, Puerto Rico and have already made significant progress in meeting previously established commitments."
>
> According to the approvable letter, FDA approval of Pristiq is subject to several conditions, including the following:
>
> - A satisfactory FDA inspection of the Company's Guayama, Puerto Rico facility, which is where Pristiq will be manufactured
>
> - Several post-marketing commitments, including submission of long-term relapse prevention, low dose and pediatric studies
>
> - Additional clarity around the Company's product education plan for physicians and patients
>
> - Confirmation by the FDA of the acceptability of the proprietary name, Pristiq
>
> As the Company has already communicated, launch timing for the MDD indication is predicated on three elements – final FDA approval for Pristiq as a treatment for adult patients with MDD, the results of ongoing MDD studies at lower dosage levels, and the progress of FDA review of Wyeth's separate New Drug Application (NDA) for vasomotor symptoms (VMS) associated with menopause. Importantly, while the approvable letter requires some post-marketing commitments, the FDA does not require that any additional clinical studies be submitted prior to the approval of Pristiq.
>
> "Given the importance of Pristiq, we are committed to ensuring the most complete profile and product information is available to physicians and patients at the time of this product's launch," Mahady says.

49. On May 9, 2007, the Individual Defendants caused or allowed Wyeth to issue a press

release that disclosed further Phase 3 testing data for Pristiq. The press release explained a number

of beneficial effects from taking Pristiq including a reduction in menopause symptoms. In particular,

the press release provided as follows:

Wyeth Pharmaceuticals, a division of Wyeth, presented results from the first Phase 3 studies evaluating Pristiq™ (desvenlafaxine) for the treatment of moderate-to-severe vasomotor symptoms (hot flashes and night sweats) associated with menopause. These studies showed that women who took Pristiq experienced a reduction in both the number and severity of hot flashes. Additional analyses presented demonstrated that Pristiq reduced the number of nighttime awakenings and mood disturbances in postmenopausal women with hot flashes and night sweats and did not have a negative effect on sexual function.

The data were presented at the 55th Annual Meeting of the American College of Obstetricians and Gynecologists (ACOG) in San Diego. Pristiq is currently under review by the U.S. Food and Drug Administration (FDA) and could be the first non-hormonal treatment for menopausal hot flashes and night sweats.

"Millions of women experience hot flashes and night sweats during menopause, but there are currently no effective non-hormonal treatment options approved by the FDA," says Joseph Camardo, M.D., Senior Vice President, Global Medical Affairs, Wyeth Pharmaceuticals. "The data indicate Pristiq has the potential to expand the range of effective treatment options by providing a non-hormonal choice for menopausal women with moderateto-severe vasomotor symptoms."

Evaluation of Safety and Efficacy

Three studies presented examine the efficacy of Pristiq at various doses while also evaluating its safety and tolerability profile. The most common side effect in all three studies was nausea, which was generally mild to moderate, was dose-dependent, and resolved quickly, on average within three days.

Efficacy and Safety of Desvenlafaxine Succinate for Treatment of Menopausal Vasomotor Symptoms

This one-year, multicenter, randomized, double-blind, placebo-controlled trial evaluated the safety and efficacy of Pristiq at multiple doses. The study included 689 postmenopausal women with 50 or more moderate-to-severe hot flashes per week. Primary endpoints were assessed at weeks four and 12 and included the daily number and severity of hot flashes and night sweats.

Results from this study showed a reduction in the number and severity of hot flashes and night sweats at weeks four and 12 for several of the doses investigated. There was a rapid onset of action – within one week of starting therapy.

Efficacy of Desvenlafaxine Succinate in the Treatment of Menopausal Vasomotor Symptoms

This six month multicenter, randomized, double-blind, placebo-controlled trial evaluated the efficacy and safety of Pristiq. The study included 541 postmenopausal women with 50 or more moderate-to-severe hot flashes per week. Primary endpoints were assessed at weeks four and 12, and included the daily number and severity of hot flashes and night sweats.

Pristiq demonstrated significant improvements compared with placebo for all primary endpoints. A statistically significant reduction in the number of hot flashes (60 to 66 percent) was maintained throughout the 26-week study period.

A Placebo-Controlled Trial of Desvenlafaxine Succinate and Tibolone for Menopausal Vasomotor Symptoms

This 12-week, multicenter, randomized, double-blind, placebo- and active-controlled trial evaluated the safety and efficacy of Pristiq. The study included 451 postmenopausal women with 50 or more moderate-to-severe hot flashes per week, in multiple countries outside of the United States.

Results showed that at weeks four and 12, all groups experienced a decrease in the number and severity of hot flashes from baseline. There was no statistically significant difference between Pristiq and placebo; whereas, the difference between active comparator and placebo was significant.

## THE TRUTH IS REVEALED

50.    On July 24, 2007, Wyeth issued a press release announcing that the Company had received an approvable letter from the FDA in regards to Pristiq. The approvable letter explained that the FDA would not approve Wyeth's NDA until the Company provided additional information regarding Pristiq's potential for serious adverse cardiovascular and hepatic effects. Further, the FDA request that this information come from a clinical trial of one year or further in duration. In other words, Wyeth will be unable to obtain FDA approval of Pristiq until it conducts at least a year's worth of additional study to establish that the drug's benefits outweigh its adverse effects. Thus, Wyeth's projected $2 billion in revenues from the drug will also be delayed for at least a year. Moreover, Wyeth may ultimately lose those revenues if it is unable to achieve FDA approval. In particular, the press release provided as follows:

Wyeth Pharmaceuticals, a division of Wyeth, announced today that it received an approvable letter from the U.S. Food and Drug Administration (FDA) for PRISTIQ™ (desvenlafaxine), a serotonin-norepinephrine reuptake inhibitor (SNRI), currently under review as a treatment for moderate-to-severe vasomotor symptoms (hot flashes and night sweats) associated with menopause.

In its letter, the FDA said that before the application could be approved, it would be necessary for Wyeth to provide additional data regarding the potential for serious adverse cardiovascular and hepatic effects associated with the use of PRISTIQ in this indication. The Agency requested that these data come from a randomized, placebo-controlled clinical trial of a duration of one year or more conducted in postmenopausal women....

## REASONS THE STATEMENTS WERE IMPROPER

51.     Wyeth's Relevant Period statements, described above, failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)     Pristiq's efficacy, safety and tolerability was not as favorable as the Company's Relevant Period statements suggested;

(b)     As a result of the foregoing, Pristiq would not reach FDA approval in the near term.

## DAMAGES TO WYETH CAUSED BY THE INDIVIDUAL DEFENDANTS

52.     As a result of the Individual Defendants' improprieties, Wyeth disseminated improper statements concerning its business prospects as alleged above.  These improper statements have devastated Wyeth's credibility as reflected by the Company's $13.3 billion market capitalization loss.  Additionally, Wyeth is now the subject of several shareholder class action lawsuits alleging securities laws violations.  The Company will face substantial costs in connection with these lawsuits.

53.     Further, as a direct and proximate result of the Individual Defendants' action, Wyeth has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred in investigating and defending Wyeth and certain officers in the class action lawsuits, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

(b)     Costs incurred from directing Wyeth to repurchase over $1.4 billion of its own shares at artificially inflate prices; and

(c)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Wyeth.

54.     Moreover, these actions have irreparably damaged Wyeth's corporate image and goodwill. For at least the foreseeable future, Wyeth will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior

and have misled the investing public, such that Wyeth's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## THE IMPROPER BUYBACK

55.     During the Relevant Period, while Wyeth's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $1.4 billion worth of its own shares at an average price of approximately $50.70 share, which is substantially higher than Wyeth's current share price of less than $48 per share and comparable to the $53.53 per share the defendants averaged in selling their own Wyeth stock holdings during the Relevant Period.  On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider Pristiq's prospects for FDA approval.  While Wyeth was repurchasing these shares, the Insider Selling Defendants made the sales described below.

## INSIDER SELLING

56.     The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect.  They also knew that the misstatements would create an inflated stock price.  The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth.  Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Wyeth's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **ESSNER** | 2/27/2006 | 10,526 | $48.97 | $515,458.22 |
| | 3/7/2006 | 30,000 | $49.21 | $1,476,300.00 |
| | 3/8/2006 | 30,000 | $49.20 | $1,476,000.00 |
| | 10/27/2006 | 177,600 | $51.98 | $9,231,648.00 |
| | 1/25/2007 | 163 | $51.65 | $8,418.95 |
| | 2/26/2007 | 10,526 | $50.64 | $533,036.64 |
| | | **258,815** | | **$13,240,861.81** |
| | | | | |
| **MARTIN** | 2/27/2006 | 2,895 | $48.97 | $141,768.15 |
| | 3/1/2006 | 50,000 | $49.58 | $2,479,000.00 |
| | 3/1/2006 | 50,000 | $49.58 | $2,479,000.00 |
| | 10/25/2006 | 109,564 | $52.35 | $5,735,675.40 |
| | 1/25/2007 | 48 | $51.65 | $2,479.20 |
| | 2/26/2007 | 2,895 | $50.64 | $146,602.80 |
| | 4/25/2007 | 66,600 | $55.97 | $3,727,602.00 |

| | 4/25/2007 | 101,514 | $55.97 | $5,681,738.58 |
|---|---|---|---|---|
| | 4/27/2007 | 2,436 | $55.29 | $134,686.44 |
| | 4/27/2007 | 2,486 | $55.29 | $137,450.94 |
| | 4/27/2007 | 50,000 | $55.29 | $2,764,500.00 |
| | 4/27/2007 | 92,000 | $55.29 | $5,086,680.00 |
| | 5/22/2007 | 88,000 | $57.97 | $5,101,360.00 |
| | 5/22/2007 | 112,500 | $57.97 | $6,521,625.00 |
| | 6/13/2007 | 12,541 | $57.15 | $716,718.15 |
| | | **743,479** | | **$40,856,886.66** |
| | | | | |
| **POUSSOT** | 2/27/2006 | 2,575 | $48.97 | $126,097.75 |
| | 10/27/2006 | 2,600 | $52.00 | $135,200.00 |
| | 10/27/2006 | 102,666 | $52.00 | $5,338,632.00 |
| | 10/27/2006 | 115,493 | $52.00 | $6,005,636.00 |
| | 10/30/2006 | 46,507 | $51.70 | $2,404,411.90 |
| | 1/25/2007 | 48 | $51.65 | $2,479.20 |
| | 2/26/2007 | 2,780 | $50.64 | $140,779.20 |
| | | **272,669** | | **$14,153,236.05** |
| | | | | |
| **TOTAL** | | **1,274,963** | | **$68,250,984.52** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

57.     Plaintiff brings this action derivatively in the right and for the benefit of Wyeth to redress injuries suffered, and to be suffered, by Wyeth as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. Wyeth is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

58.     Plaintiff will adequately and fairly represent the interests of Wyeth in enforcing and prosecuting its rights.

59.     Plaintiff is and was an owner of the stock of Wyeth during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

60.     The current Board of Wyeth consists of the following thirteen individuals: defendants Poussot, Essner, Torell, Feerick, Mascotte, Polan, Shipley, Seidenberg, Langer, Fergusson, Rogers, Ganzi and McGuire and director Robert M. Amen.

61.     Defendants Poussot, Essner, Torell, Feerick, Mascotte, Polan, Shipley, Seidenberg, Langer, Fergusson, Rogers, Ganzi and McGuire as members of the Board during the Relevant Period

authorized the buyback of over $1.4 billion worth of the Company's shares at artificially inflated prices. The Board's decision to authorize the share buyback was not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider Pristiq's FDA approval prospects. Moreover, over half of the Board consists of directors who have over six years experience as a Wyeth director—in some cases over 20 years. Thus, the Board should have relied upon its extensive experience to consider the uncertainties apparent in Pristiq's FDA approval prospects before approving the stock buyback. Further, defendants Poussot and Essner engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

62.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding Wyeth's true business prospects given Pristiq's FDA approval prospects. While in possession of this material adverse non-public information regarding the Company, the following current members of the Wyeth Board participated in the illegal insider selling:

        (a)     while in possession of adverse non-public information, Poussot sold 272,669 shares of Wyeth stock for proceeds of $14,153,236.05; and

        (b)     while in possession of adverse non-public information, Essner sold 258,815 shares of Wyeth stock for proceeds of $13,240,861.81.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

63.     Defendants Fergusson, Langer and Polan were, during the Relevant Period, members of the Science and Technology Committee. The Science and Technology Committee's charter provides that the Science and Technology Committee is responsible for reviewing and reporting to the Board regarding Wyeth's research and development programs. Thus, the Science and Technology Committee was responsible reviewing and discussing Pristiq's FDA approval prospects.

Accordingly, defendants Fergusson, Langer and Polan breached their fiduciary duties of due care, loyalty, and good faith because the Science and Technology Committee participated in the dissemination of improper reports concerning Pristiq. Thus, Fergusson, Langer and Polan face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

64.    Defendants Feerick, Ganzi, Mascotte, Rogers and Torell were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter provides that the Audit Committee is responsible for reviewing and discussing information and guidance provided to analysts and ratings agencies. Thus, the Audit Committee was responsible for overseeing and directly participating in the dissemination of Wyeth's earnings press releases. Accordingly, defendants Feerick, Ganzi, Mascotte, Rogers and Torell breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper statements that contained improper material information concerning Pristiq. Particularly, these defendants reviewed and failed to correct Wyeth's improper statements described above. Thus, Feerick, Ganzi, Mascotte, Rogers and Torell face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

65.    The principal professional occupation of defendant Poussot is his employment with Wyeth, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Wyeth paid Poussot the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $967,035 | $5,518,110 | $4,060,380 | 1,700,000 | 2,003,211 | $160,112 |

Accordingly, Poussot lacks independence from defendants Ganzi, Mascotte, Rogers, Seidenberg and Shipley, who are not disinterested and/or independent and who exert influence over Poussot's compensation by virtue of their positions as members of the Compensation and Benefits Committee. The Compensation and Benefits Committee has the authority to review and approve Poussot's base

salary, bonus and equity compensation. This lack of independence rendered defendant Poussot incapable of impartially considering a demand to commence and vigorously prosecute this action.

66.     The principal professional occupation of defendant Essner is his employment with Wyeth, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Wyeth paid Essner the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,662,000 | $18,201,380 | 5,305,400 | 3,000,000 | 4,531,044 | $147,138 |

Accordingly, Essner lacks independence from defendants Ganzi, Mascotte, Rogers, Seidenberg and Shipley, who are not disinterested and/or independent and who exert influence over Essner's compensation by virtue of their positions as members of the Compensation and Benefits Committee. The Compensation and Benefits Committee has the authority to review and approve Essner's base salary, bonus and equity compensation. This lack of independence rendered defendant Essner incapable of impartially considering a demand to commence and vigorously prosecute this action.

67.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

68.     The Director Defendants of Wyeth, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Wyeth's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

69.     The acts complained of constitute violations of the fiduciary duties owed by Wyeth's officers and directors and these acts are incapable of ratification.

70.     Each of the Director Defendants of Wyeth authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

71.    Wyeth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Wyeth any part of the damages Wyeth suffered and will suffer thereby.

72.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recovery for Wyeth for any of the wrongdoing alleged by plaintiff herein.

73.    Plaintiff has not made any demand on shareholders of Wyeth to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Wyeth is a publicly held company with over 1.3 billion shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### COUNT I

**Derivatively Against All Defendants for Violation of §10(b) of the
Exchange Act and Rule 10b-5 Promulgated Thereunder**

74.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.    During the Relevant Period, the Individual Defendants disseminated or approved public statements that improperly portrayed the Wyeth's business prospects, growth and margins. The Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known that the Company's public statements concerning its business prospects were misleading.

76.    The Insider Selling Defendants also sold over $68 million worth of shares of Wyeth's common stock at inflated prices during the Relevant Period while in possession of material non-public information.  These defendants misappropriated Wyeth's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Wyeth

stock without disclosing the information alleged to have been concealed herein.

77.   At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Wyeth's business prospects, especially concerning the increasing competition that the Company was facing, and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing Wyeth to repurchase over $1.4 billion worth of its own stock on the open market at an average inflated price of approximately $50.70 per share, which is substantially higher than Wyeth's current share price of under $48 per share.

78.   As such, the Individual Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   Employed devices, schemes and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Wyeth and others in connection with their purchases of Wyeth common stock during the Relevant Period.

79.   As a result of the Individual Defendants' misconduct, Wyeth has and will suffer damages in that it paid artificially inflated prices for Wyeth common stock purchased on the open market. Wyeth would not have purchased Wyeth common stock at the prices it paid, had the market previously been aware that the market price of Wyeth's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Wyeth suffered damages in connection with its purchases of Wyeth common stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

80.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.    The Individual Defendants owed and owe Wyeth fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Wyeth the highest obligation of good faith, fair dealing, loyalty and due care.

82.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

83.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. In particular, Wyeth's Relevant Period statements improperly portrayed Pristiq's FDA approval prospects. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

84.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Wyeth has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

85.    Plaintiff, on behalf of Wyeth, has no adequate remedy at law.

### COUNT III

#### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

86.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Wyeth common stock on the basis of such information.

88.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Wyeth common stock.

89.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Wyeth

common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

90.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty for Abuse of Control

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Wyeth, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Wyeth to issue statements that improperly portrayed Pristiq's FDA approval prospects

93.     As a direct and proximate result of the Individual Defendants' abuse of control, Wyeth has sustained significant damages.  These damages include, but are not limited to, Wyeth's severe loss of market credibility as reflected in its $13.3 billion market capitalization loss and substantial costs in connection with the securities class action lawsuits.

94.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

95.     Plaintiff, on behalf of Wyeth, has no adequate remedy at law.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Wyeth in a manner consistent with the operations of a publicly held corporation.

98.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Wyeth has sustained significant damages in excess of billions of dollars.

99.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

100.    Plaintiff, on behalf of Wyeth, has no adequate remedy at law.

### COUNT VI

### Against All Defendants for Waste of Corporate Assets

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying bonuses to certain of its executive officers and incurring potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

103.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

104.    Plaintiff, on behalf of Wyeth, has no adequate remedy at law.

### COUNT VII

### Against All Defendants for Unjust Enrichment

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wyeth.

107.    Plaintiff, as a shareholder and representative of Wyeth, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder;

C.      Directing Wyeth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wyeth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Wyeth to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of Wyeth's directors, executives and other employees;

4.      a proposal to ensure that Wyeth prudently expends funds in stock repurchase programs;

5.      a proposal to control insider selling; and

6.      a proposal to appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Wyeth has an effective remedy;

E.     Awarding to Wyeth restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 19, 2007

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON

THOMAS G. AMON (TGA-1515)

500 Fifth Avenue, Suite 1650
New York, N.Y. 10110
Telephone: (212) 810-2431
Facsimile: (212) 810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
STEVEN J. SIMERLEIN
MARK A. GOLOVACH
JILL E. KLEMANN
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

298780_5.DOC

## VERIFICATION

I, Louis A. Kerkhoff, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the Wyeth action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 19th day of November, 2007, at San Diego, California

_____
LOUIS A. KERKHOFF